John E. Smith
SMITH & STEPHENS, PC LAW OFFICES
315 W. Pine Street
Missoula, MT 59802
Telephone: 406.721.0300
Fax: 406.721.5370
Email: john@smithstephens.com

Kevin D. Evans (*admitted pro hac vice*)
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720.200.0614
Fax: 720.200.0679
Email: kdevans@armstrongteasdale.com

*Attorneys for Defendant Quay Geza Torok*

**UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | CR-16-20-GF-BMM-2 |
| | ) | |
| | ) | **DEFENDANT QUAY GEZA** |
| | ) | **TOROK'S BRIEF IN** |
| *vs.* | ) | **SUPPORT OF MOTION TO** |
| | ) | **DISMISS COUNT II OF THE** |
| | ) | **INDICTMENT** |
| **FX DRILLING COMPANY, INC.** | ) | |
| **and QUAY GEZA TOROK,** | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| **Defendants.** | ) | |

Defendant Quay Torok, by his attorneys Kevin D. Evans and John E. Smith, respectfully requests that the Court dismiss Count II of the Indictment on the ground that 33 U.S.C. § 1321(b)(5) is unconstitutionally vague as applied to him in this case.

## I.  INTRODUCTION

Two Justices of the United States Supreme Court during the last few years have commented on the vagueness of the Clean Water Act ("CWA"). As Justice Alito said: "The reach of the Clean Water Act is **notoriously unclear**." *Sackett v. EPA*, 132 S. Ct. 1367, 1375 (2012) (Alito, J., concurring) (emphasis added). And Justice Kennedy, the very author of the "significant nexus test" articulated in *Rapanos* and used by various courts since to determine if a body is a "water of the United States," recently stated: "[T]he Clean Water Act is unique in both being quite vague in its reach, **arguably unconstitutionally vague**, and certainly harsh in the civil and criminal sanctions it puts into practice." Transcript of Oral Argument at 18:11—16, *United States Army Corps of Eng'rs v. Hawkes* (No. 15-290), available at http://www.supremecourt.gov/oral_arguments/argument_transcripts/15-290_j5fl.pdf (emphasis added).

Those comments are particularly apropos here. Torok is charged with violating Section 1321(b)(5) for failing as an alleged "person in charge" of the FX Drilling Company, Inc. ("FX") oil field in Cut Bank, Montana to report an

*accidental* leak of oil and production water to an appropriate agency of the United States Government after Torok learned on July 12, 2011 that oil had entered a coulee; the Bureau of Land Management ("BLM") claims that between 15 and 20 barrels were discharged (i.e., between 630 and 840 gallons).[1] However, the Government does not (and cannot) allege that Torok was educated regarding if and when reports were required under the CWA and, if so, to whom, or that he was authorized to make any such report to a Government agency. Thus, the evidence at trial would be that Torok's practice was to alert the FX field office about issues as they arose—and even the Government acknowledges that he did so here. (Indictment [Doc. 2] at ¶ 6). Nevertheless, the Government seeks to tag Torok as a "person in charge" for reporting purposes and convict him of a felony, which would subject him to up to five years in prison, for not reporting the discharge to the National Response Center ("NRC") on July 12, 2011.[2]

---

[1] FX believes the discharged amount was between 5 and 15 barrels, and much of that was captured upslope of the coulee. Even if one were to assume that the BLM's high-end estimate of 20 barrels were correct, the amount discharged (over 95% of which was production water) would have equated to about *.028%* of the over 3 million gallons of hazardous substances that the *EPA* admittedly caused to be released into the Animas River in southwestern Colorado during the Summer of 2015, resulting in great environmental and personal harm, and for which no one has been held criminally responsible. This disparity in treatment between the standard to which the EPA holds itself and that to which it seeks to hold private entities and individuals should not go unnoticed.

[2] It also should be noted that the NRC was informed by the Blackfeet Environmental Office ("BEO") of the discharge *roughly 24 hours* after when

Defendant Quay Geza Torok's Brief in Support of Motion to Dismiss Count II of the Indictment    Page **3** of **15**

For the reasons explained below, Section 1321(b)(5) is unconstitutionally vague as applied to Torok, and for this additional reason[3] Count II should be dismissed as to him.

## II. BACKGROUND

Quay Torok is 38 years old and is a nearly life-long Montana resident. He is married and has one child.

During his entire time with FX, Torok has worked at the FX oil production field in Cut Bank. For roughly the first 10½ years at FX, Torok worked as a heavy equipment operator, and his responsibilities included operating large equipment such as excavators and bulldozers. He was promoted to be a field supervisor in April 2011—two months before the accidental leak that is the basis of the two criminal charges the Government has brought against him. (The Government does not contend, nor could it, that the leak from the flow line (as described below) was due to any negligent or intentional misconduct of FX or Torok; it was an unforeseen and unexpected occurrence.)

The evidence at trial also would show the following:

---

Torok and FX first learned on July 12 that oil had made it into the coulee in question. (Indictment at ¶ 14).

[3] Torok also has joined in Defendants' Joint Motion To Dismiss Indictment on other grounds; that Motion is being filed contemporaneously herewith.

On Sunday, June 12, 2011, Torok was serving as a "relief pumper." While doing so he discovered a leak that appeared to be coming from an underground flow line. Torok immediately shut down the flow line and wells 13-4 and 22-2, which were connected thereto. Torok then alerted Laura Bacon—the FX field office manager and one of Torok's bosses (*see* Indictment at ¶ 6 (Torok "reported the discovery of the ruptured flow line to his supervisor, L.B., and conducted and directed repairs to the ruptured flow line")). He also walked down a grassy slope toward a fence, which was located about 600 feet from the flow line; it appeared that the leak had stopped in the tall grass short of the fence line.[4] Because Torok alone could not do what was necessary to excavate the area around the flow line and make any necessary repairs, he left the flow line and wells turned off.

The next day—Monday, June 13, 2011—Torok went to the site of the accidental leak along with two other FX employees. They brought an excavator with them and proceeded to excavate the area around the flow line. Torok and the other FX employees discovered a small crack in the fiberglass flow line, which they repairedusing a sleeve and then turned the wells and flow line back on; no further leak was observed. Because there had been heavy precipitation up to that

---

[4] This made sense because FX records show that on June 11, 2011—the day before Torok discovered the leak and shut down the flow line and two wells—another FX employee had checked wells 13-4 and 22-2 and no leak was observed. Moreover, FX records reflect that wells 13-4 and 22-2 at that time only produced about 1.1 barrels of oil, and about 66.3 barrels of production water, per day.

Defendant Quay Geza Torok's Brief in Support of Motion to Dismiss Count II of the Indictment  Page **5** of **15**

point during the Spring of 2011, it was decided not to fill the excavated area around the repaired flow line due to concern that covering the flow line with heavy mud might damage the repair. Over the course of the next month the repaired flow line was visible, and there was no sign of further leakage.

Additional heavy equipment was not brought in at that time to remove the oil that appeared to stop in the grassy area just down slope from the flow line; the land was quite muddy and doing so would have caused significant damage to the farmer's land on which the flow line and wells were located. Instead, it was determined to wait until the land dried to clean up the accidental leak and remediate the area.

The Government says that on or about July 11, 2011, a local rancher apprised the BEO of an oil leak spreading in the coulee that eventually intersects with Cut Bank Creek between three-quarters and 1 mile from the site of the flow line. (Indictment at ¶¶ 9—10). The grassy slope where the oil appeared to have stopped on June 12 continues downward and eventually meets that coulee. The FX field office was apprised by the BLM on July 12 that oil was found in the coulee, and Torok was alerted of this by the FX field office; this is the first time that FX and Torok learned that oil had made it into the coulee. Various representatives of the Blackfeet Tribe, Environmental Protection Agency ("EPA"), and BLM met

with Torok and other FX employees on site over the next several days, and continued to interact with FX during the cleanup and remediation process.

The Government claims that a representative of the BEO told Torok on July 12 to call the NRC. (Indictment at ¶ 12). However, the detailed Blackfeet incident report for that day makes no mention of any such directive; instead, it says that Torok was told by the Blackfeet Tribal Response Program staff to "notify Laura Bacon, FX Drilling Company, Owner/Operator." The evidence would demonstrate that Torok in fact spoke with the FX field office that very day.[5] Again, Torok was not educated regarding the reporting requirements under the CWA, nor was he authorized to make such a report. Thus, he followed the practice of alerting the FX field office about issues as they arose.

On July 12, Torok and other FX employees also took steps to prevent any further spread of oil and production water. For instance, booms were installed in the lower section of the coulee. On July 13, with the permission of the Blackfeet Tribe, FX constructed an earthen dam near the end of the coulee prior to the point that it intersects with Cut Bank Creek. In addition, a boom was placed at the confluence of the coulee and Cut Bank Creek, and absorbent pads were placed on accumulations in the coulee.

---

[5] Because Ms. Bacon was out of State attending her father's funeral, Torok spoke with another employee in the FX field office.

Also on July 12, FX contacted Roy Brown and asked him to travel immediately to the site to assist FX. Mr. Brown obtained his petroleum engineering degree from Montana Tech in 1974, and has over 30 years of experience in the oil production industry. Mr. Brown arrived the morning of July 13, walked the entire length of the grassy slope and coulee, and walked downstream of the point where the coulee intersects with Cut Bank Creek. Mr. Brown (and others, including two BLM representatives (one has since retired)) would testify if necessary that he saw no evidence of oil in the Creek, or upon features downstream where one would expect to see signs of oil if in fact oil had entered the water.

In addition, on July 12, 2011, the Blackfeet Tribe contacted Indian Country Environmental Associates ("ICEA") to respond to the site. The Blackfeet Tribe directed FX to use ICEA to perform the cleanup and remediation work, and FX agreed to do so. ICEA prepared and implemented a work plan to clean up and remediate the entire grass and coulee area affected by the accidental leak; no clean up or remediation of Cut Bank Creek was necessary. The cost of the cleanup and remediation work was nearly $330,000, which was paid by FX. EPA and Blackfeet representatives have commented that the cleanup was conducted in a professional manner, that FX was cooperative, and that the cleanup was concluded by the first week of September 2011 to everyone's satisfaction. Indeed, as the

evidence would show, the remediated area is pristine, there is no evidence of the leak, and wheat and barley grow there in abundance.

## III. SECTION 1321(b)(5) IS UNCONSTITUTIONAL AS APPLIED TO TOROK

Vagueness challenges to statutes that do not implicate First Amendment interests "are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). Accordingly, Torok seeks dismissal of Count II on the ground that Section 1321(b)(5) is unconstitutionally vague as applied to him.

It is a prerequisite to prosecution under any criminal statute that "reasonable persons would know that their conduct is at risk." *Maynard*, 486 U.S. at 361. Moreover, and equally important, the vagueness doctrine " 'require[s] that a legislature establish minimal guidelines to govern law enforcement.' " *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1972)). "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' " *Kolender*, 461 U.S. at 358 (quoting *Smith*, 415 U.S. at 575).

In the Indictment, the Government says that Torok was a "Field Supervisor" at FX. (Indictment at ¶¶ 3 & 6). The Government then proceeds to paraphrase the language of Section 1321(b)(5), and in order to charge Torok accuses him of being

a "person in charge" of the FX facility. (Indictment at ¶¶ 17 & 21). Nowhere in the Indictment does the Government assert why it contends Torok was a "person in charge" within the meaning of Section 1321(b)(5), other than simply saying he was a field supervisor (and newly appointed at that).

Application of Section 1321(b)(5) to Torok here violates the bedrock principles that underlie the vagueness doctrine, and thus Torok's due process rights. 33 U.S.C. § 1321(b)(5) provides in relevant part:

> Any ***person in charge*** of . . . an onshore facility . . . shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such . . . facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. . . . Any such person . . . who fails to notify immediately such agency of such discharge shall, upon conviction, be fined in accordance with Title 18, or imprisoned for not more than 5 years, or both. [Emphasis added][6]

The phrase "person in charge" is *not* defined in the CWA. While many other terms and phrases used in the Act are defined (*see* 33 U.S.C. § 1362; 40 C.F.R. § 122.2), this one simply is not (i.e., there are no guidelines in the CWA, minimal or otherwise, to employ in making this determination).

---

[6] "Immediately" for purposes of notification must be interpreted in light of the facts at hand. *See, e.g., United States v. Fredericks*, 38 F. Supp. 2d 396, 400 (D.V.I. 1999), *aff'd*, 254 F.3d 1079 (3d Cir. 2001) (approving jury instruction stating that "[t]he term 'immediate' must be interpreted in light of the circumstances of [the] particular case"); *United States v. Messer Oil Corp.*, 391 F. Supp. 557, 562 (W.D. Pa. 1975) ("Obviously the word 'immediate' must be interpreted in the light of the circumstances of each particular case."). Here again, the BEO had notified the NRC about 24 hours after FX and Torok first learned that oil had entered a coulee.

Defendant Quay Geza Torok's Brief in Support of Motion to Dismiss Count II of the Indictment        Page **10** of **15**

This omission is constitutionally significant here for the following reasons: What if a newly promoted field supervisor in Torok's position was not educated regarding if and when reports were required under the CWA and, if so, to whom, was not authorized to make a report of discharge to any Government agency, and whose practice therefore was to alert the company's field office of issues. What if that field supervisor alerted the company the very day he discovered and stopped the accidental leak, and spoke with the field office after he first observed oil in the coulee? Indeed, those are the very facts here. How, under these facts, could it possibly be said that a person in Torok's position "would know that [his] conduct [was] at risk" and that he stood susceptible to being charged with a felony? *Maynard*, 486 U.S. at 361. Moreover, one could easily imagine a prosecutor under these circumstances reasonably concluding that Torok was not a "person in charge" for reporting purposes and thus deciding that he did not violate Section 1321(b)(5), while the United States Attorney's Office here decided to charge Torok with a felony carrying a possible five-year prison sentence. *See Kolender*, 461 U.S. at 358 ("Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows . . . prosecutors[ ] and juries to pursue their personal predilections.' ").

Count II of the Indictment against Torok is the quintessential example of an unconstitutional application of a "notoriously unclear" criminal statute. As such, Count II against Torok should be dismissed.

## IV. ALTERNATIVELY, THE RULE OF LENITY REQUIRES DISMISSAL OF COUNT II BECAUSE SECTION 1321(b)(5) IS AMBIGUOUS

Alternatively, Section 1321(b)(5), including its "person in charge" requirement, is ambiguous. Where can it be gleaned that this Section, including its felony punishment, would apply to the likes of Torok—i.e., one who is not educated regarding the reporting requirements of the CWA, is not authorized to make a report, and who follows the practice of reporting issues to the company's field office? The answer is *nowhere*. With absolutely no guidelines provided in the CWA for making such determination, and considering that violation of Section 1321(b)(5) is a felony carrying the harsh penalty of up to five years imprisonment, courts should demand greater clarity.

Accordingly, and as explained on pages 19—21 of Defendants' Brief In Support Of Their Joint Motion To Dismiss Indictment, which are incorporated herein, the rule of lenity requires dismissal of Count II as to Torok. *See, e.g., United States v. Crooked Arm*, 788 F.3d 1065, 1079 (9th Cir. 2015) (holding that rule of lenity supported dismissal of indictment); *United States v. Kaluza*, 780 F.3d 647, 669 (5th Cir. 2015) (affirming dismissal of part of indictment on basis of rule

Defendant Quay Geza Torok's Brief in Support of Motion to Dismiss Count II of the Indictment        Page **12** of 15

of lenity)[7]; *United States v. Apex Oil Co.*, 132 F.3d 1287, 1291 (9th Cir. 1997) ("In the face of uncertainty as to the meaning of [the statute], the rule of lenity requires dismissal of count one of the indictment"); *United States v. McLemore*, 28 F.3d 1160, 1165 (11th Cir. 1994) (affirming trial court dismissal of indictment on basis of application of rule of lenity).

\* \* \*

WHEREFORE, Defendant Quay Torok respectfully requests that the Court dismiss Count II of the Indictment against him.

Dated this 17th day of May, 2016.

SMITH & STEPHENS, PC LAW OFFICES

*s/ John E. Smith*
By:_____
John E. Smith

ARMSTRONG TEASDALE LLP

*s/ Kevin D. Evans*
By: _____
Kevin D. Evans

*Attorneys for Defendant Quay Geza Torok*

---

[7] *See also United States v. Fafalios*, 817 F.3d 155, 161 (5th Cir. 2016) ("[T]he rule of lenity cautions against adopting the government's strained reasoning regarding why the duty to 'maintain' the oil record book should extend to [the defendant]. *See United States v. Kaluza*, 780 F.3d 647, 669 (5th Cir. 2015) (stating that the rule of lenity requires that 'ambiguous criminal laws be interpreted in favor of the defendants subjected to them' . . . .").

# CERTIFICATE OF COMPLIANCE

Pursuant to L.R. CR 47.2(c), I certify that Defendant Quay Geza Torok's Brief In Support Of Motion To Dismiss Count II Of The Indictment is double spaced, is a proportionately spaced 14 point typeface, and contains 2,563 words.

/s/ *John E. Smith*
SMITH & STEPHENS, P.C. LAW OFFICES

# CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of May, 2016, a true copy of the foregoing was served:

Via ECF to the following parties:

Kris A. McLean
Assistant U.S. Attorney
Ryan G. Weldon
Assistant U.S. Attorney
Eric E. Nelson
Special Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 8329
Missoula, MT 59807
Phone: (406) 542-8851
Fax: (406) 542-1476
Email: kris.mcLean@usdoj.gov
       Ryan.Weldon@usdoj.gov
       nelson.eric@epa.gov


       /s/ *John E. Smith*
       SMITH & STEPHENS, P.C. LAW OFFICES