Catherine A. Laughner
M. Christy S. McCann
Browning, Kaleczyc, Berry &
Hoven, P.C.
801 W. Main, Suite 2A
Bozeman, MT 59715-0888
Telephone: (406) 585-0888
Facsimile: (406) 587-0165
cathyl@bkbh.com
christy@bkbh.com

Attorneys for FX Drilling Company,
Inc.

John E. Smith
Smith & Stephens, PC Law Offices
315 W. Pine Street
Missoula, MT 59802
Telephone: (406) 721-0300
Facsimile: (406) 721-5370
john@smithstephens.com

Kevin D. Evans (*admitted pro hac vice*)
Armstrong Teasdale LLP
4643 South Ulster Street, Suite 800
Denver, CO 80237
Telephone: (720) 200-0614
Facsimile: (720) 200-0679
kdevans@armstrongteasdale.com

Attorneys for Quay Geza Torok

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FX DRILLING COMPANY, INC., and QUAY GEZA TOROK,<br><br>Defendants. | Case No. CR-16-20-GF-BMM-2<br><br>**DEFENDANTS' BRIEF IN SUPPORT OF THEIR JOINT MOTION TO DISMISS INDICTMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

# Table of Contents

Table of Authorities .................................................................................. iii

BACKGROUND FACTS ........................................................................... 1

STANDARD OF REVIEW ........................................................................ 4

ARGUMENT ............................................................................................. 5

I.   COUNT I OF THE INDICTMENT SHOULD BE DISMISSED
     BECAUSE IT FAILS TO STATE A CRIMINAL OFFENSE ........................ 5

     A.   The Clean Water Act Does Not *Criminalize* A
          Failure To Control Or Remove Accidentally
          Discharged Oil .......................................................................... 6

          1.   *"Discharge" and "Removal" are Separate
               and Distinct Concepts, and are Treated
               Very Differently, Under the Plain
               Language of the CWA* ...................................................... 7

               a.   "Discharge" as used in § 1321(b)(3)
                    does not include a removal or failure
                    to control oil ............................................................ 8

               b.   The CWA reserves criminal sanctions
                    to negligent and knowing "discharges"
                    of oil ........................................................................ 10

          2.   *The Legislative History Further Demonstrates
               That "Discharge" and "Removal" are Separate
               Concepts Under the CWA* ................................................ 10

     B.   The Indictment Fails To State The Offense Of
          Negligent Discharge Of Oil ...................................................... 12

          1.   *The Indictment Does Not (and Cannot) Allege
               That Defendants Caused the Discharge of
               Oil From the Flow Line* ................................................... 12

2. *No Other "Discharge" Occurred* .................................... 13

    a. The Indictment shows that no "active conduct" caused the supposed "discharge." .................. 13

    b. The Indictment also shows that the supposed "discharge" did not come from a "point source." .............................................. 15

        i. A "point source" requires some activity to collect or channel oil .......................... 15

        ii. A "discharge" under § 1321(a)(2) must come from a "point source." ..................... 16

        iii. Other than the flow line (from which Defendants did not negligently discharge oil), no "point source" exists here ........... 18

C. The Rule Of Lenity Requires Dismissal To The Extent The Relevant Provisions Of The CWA Are Deemed Ambiguous ................................ 19

II. THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE CWA IS UNCONSTITUTIONALLY VAGUE AS APPLIED ......................... 21

A. Ordinary People Could Not Understand What Conduct Was Prohibited ................................................ 21

1. *Determination of Jurisdictional Waters is Unconstitutionally Vague as Applied* ............. 22

2. *Requirement to Report Discharge "Immediately" Is Unconstitutionally Vague as Applied* .......... 26

B. The CWA Did Not Provide The EPA With Clear Standards To Constrain Its Enforcement ........... 28

CONCLUSION ................................................................ 30

## Table of Authorities

**Cases**

*Adamo Wrecking v. United States*, 434 U.S. 275 (1978).........................20

*BedRoc Ltd., LLC v. United States*, 541 U.S. 176 (2004) ................................. 9, 10

*BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994)...........................................8, 9

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
   270 F.3d 863 (9th Cir. 2001) .....................................................................5

*Chicago v. Envtl. Def. Fund*, 511 U.S. 328 (1994)...........................................8

*Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1343 (2013) ................................15

*Ecological Rights Found. v. Pacific Gas & Electric Co.*,
   713 F.3d 502 (9th Cir. 2013)...................................................................15

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998). .....................................21

*Friends of Milwaukee's Rivers & Lake Michigan Fed'n v. Milwaukee Metro.*
   *Sewerage Dist.*, 2007 WL 4410402 (E.D. Wis. Dec. 14, 2007). ..........................27

*Froebel v. Meyer,* 217 F.3d 928 (7th Cir. 2000)....................................................16

*Hamker v. Diamond Shamrock Chem. Co.*,
   756 F.2d 392 (5th Cir. 1985) ..................................................................... 17, 18

*Hanousek v. United States*, 528 U.S. 1102 (2000) ................................................12

*In re Deepwater Horizon*, 745 F.3d 157 (5th Cir. 2014)............................. 6, 14, 16

*In re Deepwater Horizon*, 753 F.3d 570 (5th Cir. 2014).................................. 16, 18

*In re Nova Chemicals, Inc.*, 2006 WL 2847397 (ALJ Aug. 2, 2006) ....................27

*Kolender v. Lawson*, 461 U.S. 352, (1983).............................................................21

*Marathon Oil v. U.S. E.P.A.*,
   1998 WL 34075426 (D. Wyo. Aug. 20, 1998)......................................................13

*Nw. Forest Res. Council v. Glickman*,
   82 F.3d 825 (9th Cir. 1996).......................................................................5

*Northwest Envtl. Def. Ctr. v. Brown*,

  640 F.3d 1063 (9th Cir. 2011) ................................................................18

*Oregon Nat. Desert Ass'n v. Dombeck*,

  172 F.3d 1092 (9th Cir. 1998) ................................................................16

*Rapanos v. United States*, 547 U.S. 715 (2006) .............................. 22, 23

*Sackett v. EPA*, 132 S. Ct. 1367 (2012) ....................... 5, 19, 25, 28, 29

*United States v. Apex Oil Co.*, 132 F.3d 1287 (9th Cir. 1997) ...............20

*United States v. Boren*, 278 F.3d 911 (9th Cir. 2002). ...........................5

*United States v. Crooked Arm*,

  788 F.3d 1065 (9th Cir. 2015) ........................................ 5, 7, 9, 10, 20

*United States v. Erickson*, 75 F.3d 470 (9th Cir. 1996)..........................21

*United States v. Fafalios*, 817 F. 3d 155 (5th Cir. 2016)................... 10, 20

*United States v. Hanousek*, 176 F.3d 1116 (9th Cir. 1999) ...................12

*United States v. Harriss*, 347 U.S. 612 (1954). ....................................25

*United States v. Kaluza*, 780 F.3d 647 (5th Cir. 2015)..........................20

*United States v. Kennecott Copper Corp.*,

  523 F.2d 821 (9th Cir. 1975)..................................................................26

*United States v. Lanier*, 520 U.S. 259 (1997)........................................20

*United States v. Lucas*, 516 F.3d 316 (5th Cir. 2008) ...................... 24, 25

*United States v. McLemore*, 28 F.3d 1160 (11th Cir. 1994)...................20

*United States v. Omer*, 395 F.3d 1087 (9th Cir. 2005) ....................... 5, 19

*United States v. Shabani*, 513 U.S. 10 (1994) ......................................20

*United States v. Shear*, 962 F.2d 488 (5th Cir. 1992)..............................7

*United States v. Stansell*, 847 F.2d 609 (9th Cir. 1988) .........................21

*United States v. Talbot*, 51 F.3d 183 (9th Cir. 1995)..............................21

*United States v. W.R. Grace*, 455 F. Supp. 2d 1122 (D. Mont. 2006)....20

*United States v. Woody Fashions, Inc.*,

  190 F. Supp. 709 (S.D.N.Y. 1961) ...........................................................7

## Statutes and Regulations

33 U.S.C. § 1319 ........................................................ 7, 10, 11, 13, 15, 17

33 U.S.C. § 1321 ............................................. 7, 8, 9, 10, 11, 13, 14, 17, 22, 28, 29

33 U.S.C. § 1362. ................................................................... 13, 15, 21

40 C.F.R. § 110.1 ...............................................................................29

## Other Authorities

Ambrose O.O. Ekpu, *Environmental Impact of Oil on Water: A Comparative
Overview of the Law and Policy in The United States and Nigeria*,
24 Denv. J. Int'l L. & Pol'y 55 (1995) ...................................................17

EPA Website, Clean Water Rule Litigation Statement ...........................................24

Clean Water Rule: Definition of Waters of the United States**,**
80 Fed. Reg. at 37056 (2015). ................................................... 23, 29, 30

H.R. REP. NO. 101-653, *reprinted in* 1990 U.S.C.C.A.N. 779 ...............................11

MERRIAM WEBSTER DICTIONARY ....................................................... 8, 14

Oil Pollution Act of 1990, PL 101-380, 104 Stat. 484 . ..........................................11

Oxford Dictionaries Online, U.S. Edition .................................................17

Pacific Coastal and Marine Science Center, "Some Examples of Oil & Gas Seeps,"
(available at http://walrus.wr.usgs.gov/seeps/examples.html). .............................17

Stephen J. Darmody, *The Oil Pollution Act's Criminal Penalties:  On A Collision
Course with the Law of the Sea*, 21 B.C. ENVTL. AFF. L. REV. 89, 110 (1993)....11

Transcript of Oral Argument, *United States Army Corps of Eng'rs v. Hawkes* (No.
15-290) ....................................................................... 19, 22

The Government has charged Defendants FX Drilling Company, Inc. ("FX") and Quay Geza Torok ("Torok") (collectively "Defendants") with two violations of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("CWA" or Act). The first Count alleges negligent discharge of oil into waters of the United States in a quantity that may be harmful, a misdemeanor, in violation of 33 U.S.C. §§ 1321(b)(3), 1319(c)(1)(A), and 18 U.S.C. § 2. The second Count alleges failure to immediately notify the appropriate federal agency of a discharge of oil into waters of the United States in a quantity that may be harmful, a felony, in violation of 33 U.S.C. § 1321(b)(5) and 18 U.S.C. § 2. Because the Government attempts to criminalize conduct the CWA does not punish as criminal behavior and fails to state an offense for negligent discharge, and because the Act is unconstitutionally vague as applied to this case, Defendants move to dismiss the Indictment.

## BACKGROUND FACTS

The Indictment arises out of an *accidental* leak that occurred at the FX oil production field in Glacier County, Montana, on or about June 11, 2011. The FX oil production field is located within the boundaries of the Blackfeet Indian Reservation. The portion of the field where the accidental leak occurred is owned by an area farmer. Torok discovered a leak that appeared to be coming from an underground flow line on Sunday, June 12, 2011. (Indictment, ¶ 1). Torok immediately turned off and shut in the two wells (13-4 and 22-2) connected to the

flow line, which stopped the leak. (*See id.*, ¶¶ 5–6). Torok also walked a distance down the grassy slope away from the flow line and toward a fence, where it appeared to him that the leaked oil and production water stopped in the tall grass.

Because Torok alone could not excavate the area around the flow line to make any necessary repairs, he left the flow line and wells turned off. The next day, Torok and two other FX employees repaired the accidental crack in the flow line by excavating around the line and using a sleeve to repair the small crack in the fiberglass. (*Id.*, ¶ 6). With the crack repaired, they turned the wells and flow line back on and observed no further leak. Wells 13-4 and 22-2 produced only about 1.1 barrels of oil and about 66.3 barrels of production water per day and had been checked by another FX employee on June 11 with no sign of any leakage.[1] Therefore, the total amount of fluid estimated to have leaked from the flow line was below the reportable threshold for the Bureau of Land Management ("BLM").

Due to recent heavy precipitation in the area, it was decided not to fill the excavated area around the flow line and not to bring in heavy equipment to remove

---

[1] The BLM claims between 15 and 20 barrels were discharged (i.e., between 630 and 840 gallons of oil and production water). FX believes the discharged amount was between 5 and 15 barrels. Even if the BLM's high-end estimate of 20 barrels were correct, the amount discharged (over 95% of which was production water) would have equated to about .028% of the over 3 million gallons of hazardous substances the EPA admittedly caused to be released into the Animas River in southwestern Colorado during the Summer of 2015, causing great environmental and personal harm, for which no one has been held criminally responsible, illustrating the disparity in treatment between the standard to which EPA holds itself and that to which it seeks to hold private entities and individuals.

the oil in the farmer's field. Taking such action when the ground was so muddy could have significantly damaged the farmer's land and crops and the repair to the line. It was decided to remediate the spill after the land had a chance to dry. Over the next month, the repaired flow line was visible and routinely inspected; there was no sign of further leakage.

The Government alleges that on or about July 11, 2011, a local rancher apprised the Blackfeet Environmental Office ("BEO") that oil was spreading in the natural coulee down slope from the site of the flow line. (*Id.*, ¶¶ 9–10). The grassy area where the oil appeared to have stopped on June 12 and 13 continues downward and eventually meets the natural coulee. On July 12, BLM apprised FX that oil was found in the coulee. Various representatives of the BEO and BLM met with Torok and other FX employees on site on July 12; they subsequently were joined by representatives of the Environmental Protection Agency ("EPA"), and continued to interact and work with FX during the ensuing cleanup and reclamation.

On July 12, Defendants took steps to prevent the further spread of oil and production water. For instance, booms were installed in the lower section of the coulee and absorbent pads were placed in spots where oil had accumulated. On July 13, with the permission of the BEO, FX constructed an earthen dam near the

end of the coulee, prior to its intersection with Cut Bank Creek.  In addition, a boom was placed at the confluence of the coulee and Cut Bank Creek.

FX also contacted a contractor, Roy Brown, on July 12 and asked him to travel immediately to the site.  Mr. Brown has over 30 years of experience in the oil production industry.  He arrived at the site on July 13, 2011 to assist FX.  The BEO contacted Indian Country Environmental Associates ("ICEA") to respond to the site on July 12, 2011.  ICEA prepared and implemented a work plan to remediate the grassy field, slope, and coulee.  No cleanup of Cut Bank Creek was required.  FX paid the entire cost of the clean up and reclamation work, approximately $330,000.  EPA and Blackfeet representatives commented that the work was conducted in a professional manner, that FX was cooperative, and that the cleanup was concluded by the first week of September 2011 to everyone's satisfaction.

EPA agents conducted their jurisdictional determination, after which EPA concluded that the coulee qualified as "waters of the United States," on July 9, 2014—approximately three years after the accidental leak.

## STANDARD OF REVIEW

"In ruling on a pretrial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment.  …  [T]he court must accept the truth of the allegations in the indictment in analyzing

4

whether a cognizable offense has been charged. The indictment either states an offense or it doesn't." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) (citations omitted). "[A]n indictment's complete failure to recite an essential element of the charged offense is not a minor or technical flaw subject to harmless error analysis, but a fatal flaw requiring dismissal of the indictment." *United States v. Omer*, 395 F.3d 1087, 1088 (9th Cir. 2005) (internal quotation marks omitted) (citation omitted).

In matters of statutory interpretation, the Court must begin by analyzing the text of the statute. *United States v. Crooked Arm*, 788 F.3d 1065, 1073 (9th Cir. 2015) (citing *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 830–31 (9th Cir. 1996)). The Court may consider the legislative history if the statute is ambiguous or "if 'the legislative history clearly indicates that Congress meant something other than what it said.'" *Crooked Arm*, 788 F.3d at 1073 (quoting *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (en banc)).

## ARGUMENT

### I. COUNT I OF THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT FAILS TO STATE A CRIMINAL OFFENSE.

Count I of the Indictment is a strained effort to expand the reach of the criminal provisions of the already "notoriously unclear"[2] CWA well beyond the plain language of the statute or any case precedent. This effort suffers from at least

---

[2] *Sackett v. EPA*, 132 S. Ct. 1367, 1375 (2012) (Alito, J., concurring).

two independently fatal flaws:  (1) the CWA does not *criminalize* a failure to remove or control accidentally discharged oil; and (2) the Indictment does not allege a negligent discharge of oil, as it fails to identify negligence associated with the "[(a)] active conduct or movement [of oil] from [(b)] a point source."  *In re Deepwater Horizon*, 745 F.3d 157, 171–72 (5th Cir. 2014).  Moreover, to the extent that the Court determines that the CWA is ambiguous on either of these issues, the rule of lenity requires dismissal.

### A. The Clean Water Act Does Not *Criminalize* A Failure To Control Or Remove Accidentally Discharged Oil.

Count I of the Indictment charges Defendants with the negligent discharge of oil in violation of 33 U.S.C. §§ 1321(b)(3) and 1319(c)(1)(A).  However, the Indictment does not (and cannot) allege that either FX or Torok negligently caused the "discharge" of oil from the "underground flow line" in question (*see* Indictment, ¶ 5); that event was an unequivocal accident.

Instead, the Government stretches for a novel theory that Defendants engaged in *criminal* misconduct because after  Torok "discovered" the accidental discharge, "reported the discovery … to his supervisor," and "conducted and directed repairs to the flow line," Defendants purportedly "failed to exercise reasonable care to expeditiously **control** the discharged oil" and "failed to promptly **remove** or initiate actions to **stabilize and remediate** the oil discharge accumulations to prevent the oil from reaching waters of the United States." (*Id.*,

¶¶ 5–6 (emphases added)).  Because the CWA does not criminalize an alleged failure to "control," "remove," "stabilize," or "remediate," Count I fails to state a criminal offense.  *See Crooked Arm*, 788 F.3d at 1080 (reversing district court's denial of motion to dismiss one of charged counts); *United States v. Shear*, 962 F.2d 488, 490–92, 496 (5th Cir. 1992) (reversing defendant's conviction where indictment did not allege and government did not prove defendant's conduct was a criminal violation of Occupational Safety and Health Act); *United States v. Woody Fashions, Inc.*, 190 F. Supp. 709, 710–11 (S.D.N.Y. 1961) (dismissing counts of indictment for which a civil and not a criminal penalty was provided).

## 1. *"Discharge" and "Removal" are Separate and Distinct Concepts, and are Treated Very Differently, Under the Plain Language of the CWA.*

33 U.S.C. § 1321(b)(3) provides "[t]he discharge of oil … into or upon the navigable waters of the United States [or] adjoining shorelines … in such quantities as may be harmful … is prohibited."  *Discharges* that are knowing or negligent are subject to criminal penalties under the section of the CWA entitled "Enforcement," 33 U.S.C. § 1319(c).  *See* 33 U.S.C. § 1319(c)(1)(A) (negligent violation of § 1321(b)(3)); § 1319(c)(2)(A) (knowing violation of § 1321(b)(3)).

By contrast, violations related to *removal* of oil are addressed in a distinct subparagraph that provides for civil penalties only.  33 U.S.C. § 1321(b)(7)(B).  Failing to remove oil is not a crime under the CWA.

### a. "Discharge" as used in § 1321(b)(3) does not include a removal or failure to control oil.

33 U.S.C. § 1321(a)(2) states a "'discharge' includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping." "Discharge" is not defined to include a failure to remove or to control already discharged oil, the conduct of which Defendants are accused in the Indictment. (*See* Indictment, ¶ 6). That section of the CWA also separately defines the terms "remove" and "removal." 33 U.S.C. § 1321(a)(8). The CWA's separate definitions of the terms "discharge" and "removal" demonstrate the terms are in fact distinct. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) ("'[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.'") (quoting *Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 338 (1994)).

This distinction in the statutory definitions of "discharge" and "removal" also is consistent with the words' common definitions. For example, "to discharge" is defined as "to pour forth fluid or other contents." MERRIAM WEBSTER DICTIONARY, available at http://www.merriam-webster.com/dictionary/discharge. "Discharge" is not commonly defined as a failure to remove or remediate. On the other hand, "to remove" is commonly understood as "to move by lifting, pushing aside, or taking away or off … [or] to get rid of." *Id.*, available at http://www.merriam-webster.com/remove. Moreover,

throughout the broader context of the CWA, Congress consistently differentiates between "discharge" and "removal" of a discharge. *Compare* 33 U.S.C. § 1321(b)(7)(A) *with* § 1321(b)(7)(B) (providing for separate and distinct civil penalties for "discharges" and "fail[ure] to properly carry out removal of the discharge").

Because courts endeavor to interpret phrases in a manner that gives the phrases a consistent meaning throughout the statute (*Crooked Arm*, 788 F.3d at 1074), the statutory language mandates the conclusion that a discharge of oil and a failure to remove a discharge of oil are separate concepts within the CWA. For example, the definition of "removal costs" (i.e., "the costs of removal of oil or a hazardous substance that are incurred after it is discharged") implies removal (and relatedly, a failure to remove) is conduct that takes place after a discharge has occurred. *See* 33 U.S.C. § 1321(a)(25).

The "preeminent canon of statutory interpretation requires [courts] to presume that [the] legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal quotation marks omitted). Here, the Court must presume that Congress intended to define discharge and removal separately and to criminalize only negligent or knowing "discharges." *BFP*, 511 U.S. at 537.

### b.     The CWA reserves criminal sanctions to negligent and knowing "discharges" of oil.

While the CWA criminalizes negligent discharges of oil, 33 U.S.C. §§ 1319(c), 1321(b)(3), it imposes only civil penalties for a "fail[ure] to properly carry out removal of the discharge." 33 U.S.C. § 1321(b)(7)(B). Congress omitted any reference to "removal of a discharge" from the criminal penalty provision of the Clean Water Act. *See* 33 USC §§ 1319(c); 1321(b)(3). It would subvert the express language of the CWA to hold Defendants criminally liable for an alleged negligent failure to remove an oil discharge, as charged in the Indictment. Under the "longstanding canon *expressio unius exclusio alterius* ['inclusion of one thing implies the exclusion of the other'], [the Court] must presume that the exclusion" of ['removal' from § 1321(b)(3)] was intentional." *Crooked Arm*, 788 F.3d at 1075. *See also United States v. Fafalios*, 817 F. 3d 155, 159 (5th Cir. 2016) (invoking canon of *expressio unius est exclusion alterius*). The plain language of the CWA indicates Congress did not intend to criminalize the "fail[ure] to promptly remove or initiate actions to stabilize and remediate [an] oil discharge." (Indictment, ¶ 6). Thus, Count I of the Indictment should be dismissed.

### 2.     *The Legislative History Further Demonstrates That "Discharge" and "Removal" are Separate Concepts Under the CWA.*

Where the statutory text is clear, as in the above definitions of "discharge" and "removal," courts need not consider a statute's legislative history. *BedRoc*,

541 U.S. at 186.  Here, neither the statutory text nor the legislative history of the CWA support the novel theory charged in the Indictment.  That said, the legislative history of §§ 1319 and 1321 of the CWA further indicates that Congress intended to criminalize only negligent or knowing *discharges* of oil, not a negligent *failure to remove* oil.

The Oil Pollution Act of 1990 ("OPA") imposed criminal penalties for negligent or knowing discharges of oil.  Prior to the passage of the OPA, § 1319 did not provide for criminal penalties for discharges of oil under § 1321.  *See* 33 U.S.C. §§ 1321, 1319 (1988 & Supp. II 1990); Stephen J. Darmody, *The Oil Pollution Act's Criminal Penalties:  On A Collision Course with the Law of the Sea*, 21 B.C. Envtl. Aff. L. Rev. 89, 110 (1993).  In addition, the OPA contemporaneously enacted specific provisions related to the *removal* of oil, strengthening the federal government's authority to order the removal of oil and to conduct the removal action itself.  Oil Pollution Act of 1990, PL 101-380, 104 Stat. 484.  The 1990 legislative history of the OPA consistently refers to "discharge" and "removal" as separate and distinct activities, and the relevant U.S. House and Senate Committee Reports do not evidence any intent to criminalize a failure to promptly remove a discharge of oil.  *See generally* H.R. Rep. No. 101-653, *reprinted in* 1990 U.S.C.C.A.N. 779.  The legislative history thus confirms

Congress did not intend to impose criminal penalties for failure to remove a discharge of oil.

## B.  The Indictment Fails To State The Offense Of Negligent Discharge Of Oil.

To state an offense of negligent discharge of oil in violation of 33 U.S.C. §§ 1321(b)(3) and 1319(c)(1)(A), the Indictment must allege:  (a) Defendants caused the discharge, (b) into a navigable waterway of the United States, (c) in a quantity that may be harmful, and (d) as a result of their negligence.  *See United States v. Hanousek*, 176 F.3d 1116, 1123 (9th Cir. 1999).[3]  The Indictment here fails to state such an offense.

### 1.  The Indictment Does Not (and Cannot) Allege That Defendants Caused the Discharge of Oil From the Flow Line.

The Indictment alleges oil entered into navigable waters after leaking from a ruptured underground flow line.  (Indictment, ¶ 7).  But the Government does not—and cannot—accuse Defendants of negligently causing that rupture.  To the contrary, the only supposed negligent conduct alleged in the Indictment occurred

---

[3] Although *Hanousek* correctly observed that a defendant must have caused the discharge through his own negligence, Defendants maintain that *Hanousek* erred in holding that 33 U.S.C. § 1321(b)(3) requires proof of *ordinary* rather than *gross* negligence.  176 F.3d at 1121.  *See Hanousek v. United States*, 528 U.S. 1102 (2000) (Thomas, J., dissenting from denial of certiorari) (The "seriousness of … [the] penalties [imposed by the CWA] … counsels against concluding that the CWA can accurately be classified as a public welfare statute.").  Defendants specifically reserve their argument that gross negligence is required under § 1321(b)(3).

*after* the oil was accidentally discharged from the flow line. Indeed, the Indictment alleges that after Torok "discovered" the flow line had ruptured (*id.*, ¶ 5), he and FX "failed to exercise reasonable care to expeditiously control the [already] discharged oil" (*id.*, ¶ 6). Defendants did not cause the accidental leak from the flow line; thus, it cannot support a charge under §§ 1319(c)(1)(A) and 1321(b)(3).

## 2. No Other "Discharge" Occurred.

The Government, undeterred by the CWA's limits, attempts to expand the reach of the CWA's criminal provisions by claiming Defendants negligently discharged oil when they allegedly failed to control the flow of oil that had already been discharged. In effect, the Government advances a novel and insupportable theory that Defendants' alleged delay in removing the oil after it was accidentally discharged from the flow line somehow constitutes a separate*,* subsequent discharge. This argument reaches too far, failing for at least two reasons:

### a. The Indictment shows that no "active conduct" caused the supposed "discharge."

33 U.S.C. § 1362(12) (the definitions section of the CWA) identifies a "discharge" as "any addition of any pollutant to navigable waters from any point source." In contrast, § 1321(a)(2) "more narrowly define[s]" the activities that constitute a "discharge." *Marathon Oil v. U.S. E.P.A.*, 1998 WL 34075426, at *4 (D. Wyo. Aug. 20, 1998). Specifically, under § 1321(a)(2), a "discharge" of oil "includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting,

emptying or dumping."  As the Fifth Circuit recently observed, these gerunds all "connote active conduct or movement from a point source … rather than the mere passive migration or floating of oil into [navigable] waters."  *In re Deepwater Horizon*, 745 F.3d at 171–72.[4]  Thus, it is not enough merely to show that oil eventually made its way into navigable waters.  To constitute a "discharge" under § 1321(a)(2), a defendant's conduct "must take on an active cast."  *Id.* at 172.

As noted above, the Indictment does not allege Defendants caused oil to escape the flow line, negligently or otherwise.  Instead, the Government's theory is based on its allegations that oil spread to navigable waters after it was accidentally discharged from the flow line.  But the Indictment alleges no "active conduct" on the part of Defendants to cause the oil to spread from the site of the initial discharge to navigable waters.  To the contrary, the Indictment bases its claims on what Defendants allegedly failed to do:  they purportedly "failed to exercise reasonable care to expeditiously control the discharged oil," and supposedly "failed to promptly remove or initiate actions to stabilize and remediate the oil discharge accumulations to prevent the oil from reaching waters of the United States."

---

[4] That § 1321(a)(2)'s definition of "discharge" "includes, but is not limited to" these gerunds is unimportant here.  Applying the principle of *noscitur a sociis*, as the Fifth Circuit did, other activities that arguably constitute "discharges" must be "taken in context with the other gerunds" and must therefore "be given related meaning."  *In re Deepwater Horizon*, 745 F.3d at 171.

(Indictment, ¶ 6).  This conduct takes on a decidedly *passive* cast, contrasting with the *active* conduct that constitutes a "discharge" under § 1321(a)(2).

Defendants' alleged role in failing to prevent the oil's passive migration, via naturally-occurring landscape features, to navigable waters after it accidentally escaped the flow line cannot support the charge in Count I.

> **b.** **The Indictment also shows that the supposed "discharge" did not come from a "point source."**

> **i.** *A "point source" requires some activity to collect or channel oil.*

The Clean Water Act defines the term "point source" as meaning "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

Courts have consistently held the term "point source" connotes some kind of human activity to channel or collect the pollutant.  In fact, many courts have explicitly defined "point sources" as artificial or manmade conveyances.  *See, e.g.*, *Ecological Rights Found. v. Pacific Gas & Electric Co.,* 713 F.3d 502, 508 (9th Cir. 2013) (quoting *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1343 (2013) (Scalia, J., concurring in part and dissenting in part) ("stormwater discharges came from point sources, because they flowed out of *artificial* 'pipe[s],' 'ditch[es],' and

'channel[s],' 33 U.S.C. § 1362(14), and were thus not 'natural runoff'") (emphasis added)); *Froebel v. Meyer,* 217 F.3d 928, 937 (7th Cir. 2000) ("The structure of the CWA's definition of 'point source' … connotes the terminal end of an *artificial* system for moving water, waste, or other materials." (emphasis added)); *Oregon Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1098–99 (9th Cir. 1998) (reference to "the *manmade conveyances* that define a point source" (emphasis added)).

The Indictment does not and cannot allege Defendants created the coulee, or directed the oil into the coulee. Thus, the coulee (as opposed to the flow line from which the oil and production water accidentally discharged) is not a point source under the CWA.

ii.      *A "discharge" under § 1321(a)(2) must come from a "point source."*

Though § 1321(a)(2) does not expressly say that a discharge of oil is one that emanates from a "point source," both precedent and reason show that it must. First, as the Fifth Circuit has observed, each of the activities identified in § 1321(a)(2) as constituting discharges of oil or hazardous substances "connote … movement from a point source." *In re Deepwater Horizon*, 745 F.3d at 171. *See also In re Deepwater Horizon*, 753 F.3d 570, 573 (5th Cir. 2014) (observing that each of the statutory examples of a "discharge" in § 1321(a)(2) "denotes the loss of controlled confinement," and "the ordinary use of 'discharge' refers to a fluid 'flow[ing] out from where it has been confined.'" (quoting Discharge, Oxford

16

Dictionaries Online, U.S. Edition, http://www.oxforddictionaries.com/us/definition/american_english/discharge)).

Moreover, simple logic shows that § 1321(a)(2) discharges must originate from a point source—*i.e.*, some human collection or channeling of oil—lest the scope of § 1321(a)(2) be expanded beyond all reasonable bounds. Consider, for example, naturally occurring oil seeps, which were used to collect oil before the rise of the modern oil industry (and which are still quite common[5]). Rain falling on these natural seeps washes oil into waterways today as it has in the past, without any human effort. *See* Ambrose O.O. Ekpu, *Environmental Impact of Oil on Water: A Comparative Overview of the Law and Policy in The United States and Nigeria*, 24 Denv. J. Int'l L. & Pol'y 55, 59 (1995) (identifying "natural oil seeps" among sources of oil in water). No one would seriously argue an owner of land on which a natural oil seep exists commits a crime under the CWA every time rain washes a sheen of oil into a "water of the United States."[6]

---

[5] Onshore natural oil seeps exist in abundance, particularly in states like California. *See* Pacific Coastal and Marine Science Center, "Some Examples of Oil & Gas Seeps," available at http://walrus.wr.usgs.gov/seeps/examples.html.

[6] In *Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 397 (5th Cir. 1985), the court dismissed a citizen suit under 33 U.S.C. § 1365 after determining that the plaintiffs failed to identify an ongoing violation of either 33 U.S.C. § 1311 or § 1321(b)(3) following a prior discharge of oil because "no continuing addition to the ground water *from a point source* is alleged" (emphasis added). In so holding, the court relied on the definition of "point source" in § 1362(14), showing that a

### iii. *Other than the flow line (from which Defendants did not negligently discharge oil), no "point source" exists here.*

The Indictment alleges oil made its way from the ruptured flow line "approximately three-quarters of a mile down the sloping landscape, into a natural coulee drainage, and into an unnamed tributary and adjacent wetlands that flow to Cut Bank Creek." (Indictment, ¶ 7). Beyond the flow line, the Indictment's allegations neither show nor suggest any activity or effort causing a channeling, conveyance, or confinement of oil by either Defendant. Just the opposite, in fact— the Indictment alleges Defendants did not "expeditiously *control* the discharged oil," thereby allegedly causing "the *uncontrolled* discharge of oil." (*Id.*, ¶¶ 6–7 (emphases added)). The sloping landscape, natural coulee, alleged tributary, and purported wetlands are a series of natural geological features through which the oil "r[a]n[ ] off and dissipate[d] in a natural and unimpeded manner." *Northwest Envtl. Defense Ctr. v. Brown*, 640 F.3d 1063, 1070 (9th Cir. 2013), rev'd on other grounds at 133 S.Ct. 1326 (2013). None of these features constitute point sources. The only "point source" here—i.e., the only point where oil was controlled or confined—was the flow line. Thus, the only "discharge" the Indictment alleges is "the loss of controlled confinement" that occurred when the oil "flow[ed] out from" the flow line, "where it ha[d] been confined." *Deepwater Horizon*, 753 F.3d

---

"discharge" as defined in § 1321(a)(2) must come from a "point source" as defined in § 1362(14). *Id.*

at 573.  Count I of the Indictment does not (and cannot) allege Defendants caused this discharge, and thus, the Indictment does not allege that any negligence of Defendants caused the discharge of oil into the waters of the United States.  "[T]he indictment's failure to recite an essential element of the charged offense … is a fatal flaw requiring dismissal of the indictment."  *Omer*, 395 F.3d at 1089.  For this reason too, Count I of the Indictment should be dismissed.

**C.    The Rule Of Lenity Requires Dismissal To The Extent The Relevant Provisions Of The CWA Are Deemed Ambiguous.**

As shown above, the Indictment should be dismissed because the CWA does not criminalize a failure to remove or control discharged oil, and because the Indictment fails to allege a negligent "discharge" of oil.  However, if there were any ambiguity on either of these points,[7] the rule of lenity requires dismissal of Count I of the Indictment.  "When a criminal statute's meaning remains ambiguous after application of the rules of statutory construction, the rule of lenity requires that the law be interpreted to cover only conduct that clearly falls within its scope."

---

[7] The CWA is a particularly problematic statute with respect to clarity and ambiguity, as multiple jurists, including Supreme Court Justices, have observed.  *See Sackett*, 132 S. Ct. at 1375 ("The reach of the Clean Water Act is ***notoriously unclear***.") (Alito, J., concurring) (emphasis added); Transcript of Oral Argument at 18:11-16, *United States Army Corps of Eng'rs v. Hawkes* (No. 15-290) ("[T]he Clean Water Act is unique in both being quite vague in its reach, ***arguably unconstitutionally vague***, and certainly harsh in the civil and criminal sanctions it puts into practice.") (Kennedy, J.) (emphasis added), available at http://www.supremecourt.gov/oral_arguments/argument_transcripts/15-290_j5fl.pdf.

*United States v. W.R. Grace*, 455 F. Supp. 2d 1122, 1127 (D. Mont. 2006) (citing *United States v. Lanier*, 520 U.S. 259, 266 (1997); *United States v. Shabani*, 513 U.S. 10, 17 (1994)). Any doubts as to the meaning of the CWA must therefore be resolved in favor of Defendants. *See id.* at 1132 ("'[W]e adhere to the familiar rule that where there is ambiguity in a criminal statute, doubts are to be resolved in favor of the defendant.'") (quoting *Adamo Wrecking v. United States*, 434 U.S. 275, 284–85 (1978)).

Dismissal is appropriate in the face of ambiguity. *See, e.g.*, *Crooked Arm*, 788 F.3d at 1079 (holding rule of lenity supported dismissal of indictment); *United States v. Kaluza*, 780 F.3d 647, 669 (5th Cir. 2015) (affirming dismissal of part of indictment based on rule of lenity)[8]; *United States v. Apex Oil Co.*, 132 F.3d 1287, 1291 (9th Cir. 1997) ("In the face of uncertainty as to the meaning of [the statute], the rule of lenity requires dismissal of count one of the indictment."); *United States v. McLemore*, 28 F.3d 1160, 1165 (11th Cir. 1994) (affirming trial court dismissal of indictment based on application of rule of lenity).

---

[8] *See also Fafalios*, 817 F.3d at 161 ("[The rule of lenity cautions against adopting the government's strained reasoning regarding why the duty to 'maintain' the oil record book should extend to [the defendant]. *See United States v. Kaluza*, 780 F.3d at 669 (5th Cir. 2015) (stating that the rule of lenity requires that 'ambiguous criminal laws be interpreted in favor of the defendants subjected to them'….").

Thus, while it is clear the Indictment fails to state the offense of negligent discharge of oil, the rule of lenity further requires dismissal of Count I of the Indictment.

## II. THE INDICTMENT SHOULD BE DISMISSED BECAUSE THE CWA IS UNCONSTITUTIONALLY VAGUE AS APPLIED

An "as-applied" challenge contends that the law is unconstitutional as applied to the litigant's particular circumstance, even though the law may be capable of valid application to others. *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).

The Ninth Circuit has described the applicable principles for determining whether a law is unconstitutionally vague:

> A penal regulation is void for vagueness unless it "'define[s] the criminal offense with sufficient definiteness that ordinary people can tell what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Stansell*, 847 F.2d 609, 615 (9th Cir. 1988) (quoting *Kolender v. Lawson*, 461 U.S. 352, 257 … (1983)). A regulation is not unconstitutionally vague if that regulation is capable of a limited interpretation such that "(1) ordinary people could understand what conduct is prohibited, and (2) those enforcing the law are provided with clear standards to constrain them." *United States v. Talbot*, 51 F.3d 183, 188 (9th Cir. 1995).

*United States v. Erickson*, 75 F.3d 470, 475 (9th Cir. 1996), *cert. denied*, 517 U.S. 1222 (1996). The Government's application of the CWA to the situation here violates both of the *Erickson* principles.

## A. Ordinary People Could Not Understand What Conduct Was Prohibited.

The CWA prohibits the "discharge" of oil "into or upon the navigable waters of the United States, [or] adjoining shorelines" in harmful quantities. 33 U.S.C. § 1321(b)(3). The CWA also requires that any person in charge of an onshore facility from which oil was discharged in a quantity which may be harmful into a navigable water of the United States "immediately" notify the appropriate agency. 33 U.S.C. § 1321(b)(5). As explained below, the CWA's use of "navigable waters" and "immediately" is unconstitutionally vague as applied in this case.

### 1. Determination of Jurisdictional Waters is Unconstitutionally Vague as Applied.

The meaning of "navigable waters" under the CWA has been hotly debated for years. Most recently, several Justices of the Supreme Court have lamented the Act's lack of clarity regarding its jurisdictional reach and hinted the Act itself could be unconstitutionally vague. *See Rapanos v. United States*, 547 U.S. 715, 758 (2006) (Roberts, C.J., concurring opinion) (noting interested parties would lack guidance "on precisely how to read Congress' limits on the reach of the Clean Water Act" and would be left "to feel their way on a case-by-case basis"); *see also Hawkes*, *supra* n.7

The Supreme Court last addressed the jurisdictional reach of "navigable waters" in *Rapanos*. A plurality of the Court, in an opinion written by Justice

Scalia, held the only "plausible interpretation" is that "waters of the United States" include "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] … oceans, rivers, [and] lakes.'" 547 U.S. at 739. "The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.* In a concurrence relied upon by numerous courts since *Rapanos*, Justice Kennedy explained that the statute requires the Army Corps of Engineers to "establish a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries." *Id.* at 782 (Kennedy, J., concurring).

Since *Rapanos*, the EPA has proposed a new regulation attempting to define and identify more clearly "waters of the United States." In the Executive Summary of the EPA's new rule, which is still not in effect in Montana, the EPA noted the new rule was necessary because

> [m]any waters are currently subject to case-specific jurisdictional analysis to determine whether a ''significant nexus'' exists, and this time and resource intensive process can result in inconsistent interpretation of CWA jurisdiction and perpetuate ambiguity over where the CWA applies. As a result of the ambiguity that exists under current regulations and practice following these recent decisions, almost all waters and wetlands across the country theoretically could be subject to a case-specific jurisdictional determination.

Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. at 37,056 (June 29, 2015). This new rule has not yet been implemented because of

on-going litigation.[9]  *See* EPA Website, Clean Water Rule Litigation Statement, at

https://www.epa.gov/cleanwaterrule/clean-water-rule-litigation-statement.     The

EPA itself recognizes the "ambiguity that exists under current regulation and

practice."

The Act's use of the term "navigable waters" in relation to the coulee, as

well as relevant case law and regulations, do not provide a clear understanding that

the conduct as alleged to have occurred here constitutes criminal activity under the

CWA.  The accidental leak occurred in a farmer's field, close to a mile from Cut

Bank Creek; the land between the flow line and the coulee was covered by tall

grass; the natural coulee into which the oil and production water eventually

migrated was too far from the leak to observe; and, if it flowed at all, the coulee

flowed intermittently from storm water run-off.  Ordinary people would not

believe the accidental leak or its aftermath implicated the criminal provisions of

the CWA.

Moreover, when compared to other cases involving an as-applied vagueness

challenge to the CWA's use of "navigable waters", the Act as applied here does

not give ordinary people sufficient guidance to understand the conduct at issue was

prohibited.  In *United States v. Lucas*, 516 F.3d 316, 327–28 (5th Cir. 2008), for

example, the Fifth Circuit rejected a constitutional challenge to the CWA because

---

[9] The State of Montana is one of the plaintiffs in that litigation.

defendants received warnings from multiple agencies that they were violating the CWA by intentionally discharging sewage, the property contained a network of creeks and their tributaries, and even the deeds of the property stated it was subject to laws regulating wetlands. *Id.* The court held the CWA as applied was not unconstitutionally vague because those circumstances "should have alerted 'men of common intelligence' to the possibility that the wetlands were waters of the United States under the CWA." *Id.* at 328 (internal citation omitted).

Contrast *Lucas* with the circumstances present here, where the accidental leak occurred in a sloping grassy field that eventually led to an ephemeral coulee and was close to a mile from Cut Bank Creek. "Men of common intelligence" would not have been alerted to the possibility that the accidental leak here implicated "waters of the United States." Considering the harsh penalties associated with the charges against Defendants, this lack of clarity is constitutionally significant. *See Sackett*, 132 S.Ct. at 1375 (Alito, J., concurring).

"[N]o man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954). Because the CWA is unconstitutionally vague in its use of the term "navigable waters" as applied to the coulee, the coulee cannot be considered "navigable waters."

### *2. Requirement to Report Discharge "Immediately" Is Unconstitutionally Vague as Applied.*

Count II charges Defendants with a violation of § 1321(b)(5), which (together with its pertinent regulations) requires a person in charge of an onshore facility to "immediately notify" the NRC of any discharge of what may be a harmful quantity of oil to the "waters of the United States." The Indictment alleges the BEO officials discussed their observations of the coulee and of Cut Bank Creek with Torok and "directed" Defendants to call the NRC. (Indictment, ¶ 12). It further states Defendants failed to "immediately notify" the NRC between July 12 and July 13, 2011—a delay of approximately 24 hours. (*Id.*, ¶ 13). On July 13, Blackfeet authorities contacted the NRC themselves. (*Id.*, ¶ 14). BLM officials were present at the site on July 12, and EPA officials traveled to the site on July 13 or 14. The statute's use of the word "immediately," and the Government's interpretation and application of it by charging Defendants with a felony because they did not call the NRC before BEO made the call the very next day, is unconstitutionally vague and requires dismissal of Count II.

The use of the word "immediately" in this and other statutes has come under scrutiny in various cases over the years. The Ninth Circuit in *United States v. Kennecott Copper Corp.*, 523 F.2d 821, 824 (9th Cir. 1975), evaluated whether a defendant satisfied this statutory obligation, and opined that reporting a discharge under the CWA "reasonably promptly," such as the following morning, would

have been statutorily sufficient. Some permits issued pursuant to various state discharge elimination systems require the permitee to notify the agency of discharges exceeding the permit amount "immediately," which the permit further defines as "within 24 hours after an occurrence." *See, e.g.*, *Friends of Milwaukee's Rivers & Lake Michigan Fed'n v. Milwaukee Metro. Sewerage Dist.*, 2007 WL 4410402, at *4 (E.D. Wis. Dec. 14, 2007). Even the EPA has conceded that the meaning of the term "immediately" is dependent on the circumstances of each case. *See In re Nova Chemicals, Inc.*, Docket No. CERCLA-01-2005-0051, 2006 WL 2847397, at n.8 (ALJ Aug. 2, 2006) ("[T]he Court notes, and EPA has conceded, that determining immediacy is a case-by-case determination.").

Here, the Indictment alleges the NRC was notified by the BEO within 24 hours of the time Defendants learned the leak had traveled into the coulee. (Indictment, ¶ 14). However, Defendants' alleged knowledge that production water had traveled to the coulee does not automatically mean they knew there was a discharge of a reportable quantity into waters of the United States, nor does it necessarily trigger their statutory duty to report. *See supra*, Argument § II.A. The EPA has recognized the determination as to whether a party violated the CWA by failing to report a discharge immediately is dependent on the circumstances of each case. *Nova Chemicals*, 2006 WL 2847397, at *2; *see also id.* at n.9 (noting "knowledge of a release may be determined by how a company interprets the

information it has before it" and recognizing a failure to report a discharge immediately is different where "a company [is] being hostile or indifferent to the release and any uncertainty that a release in reportable quantities [has] taken place"). To charge Defendants with a felony for failing to beat the BEO to the telephone within 24 hours of learning of the distance the leak had traveled, or for failing to contact the NRC when Government officials had already been notified and were present at the site, violates Defendants' due process rights. Accordingly, § 1321(b)(5)'s use of the word "immediately," as alleged in the Indictment and as applied to these circumstances is unconstitutionally vague. The Court should dismiss Count II.

## B. The CWA Did Not Provide The EPA With Clear Standards To Constrain Its Enforcement.

In addition to failing to provide an ordinary person with an understanding of what conduct is prohibited, the Act's use of the term "navigable waters" also does not provide the EPA with clear standards to constrain and guide its enforcement of the Act's provisions as applied in this case. As Justice Alito explained in his concurring opinion in *Sackett*:

> [T]he precise reach of the Act remains unclear. For 40 years, Congress has done nothing to resolve this critical ambiguity, and the EPA has not seen fit to promulgate a rule providing a clear and sufficiently limited definition of the phrase ["the waters of the United States"]. Instead, the agency has relied on informal guidance. But far from providing clarity and predictability, the agency's latest informal guidance advises property owners that many jurisdictional

determinations concerning wetlands can only be made on a case-by-case basis by EPA field staff.

132 S. Ct. at 1375. In its new rule, the EPA itself acknowledges that was the practice in 2011 when the conduct alleged in the Indictment took place. 80 Fed. Reg. at 37056. Here, the Indictment alleges the oil and production water resulting from the accidental leak on June 12, 2011, traveled "approximately three-quarters of a mile down the sloping landscape, into a natural coulee drainage, and into an unnamed tributary and adjacent wetlands that flow to Cut Bank Creek." (Indictment, ¶ 7). The Indictment further states:

> The unnamed tributary is a tributary to Cut Bank Creek. The unnamed tributary and abutting wetlands have a hydrologic connection to Cut Bank Creek approximately 600 linear feet upstream from its confluence with Cut Bank Creek. Cut Bank Creek is a tributary to the Marias River, a traditional navigable water. The unnamed tributary, wetlands abutting the unnamed tributary, Cut Bank Creek, and the Marias River are "waters of the United States." 33 U.S.C. § 1321(b)(3); 40 C.F.R. § 110.1.

(*Id.*, ¶ 16).

The EPA did not make its jurisdictional determination until approximately three years after the alleged discharge took place, when its field agent traveled to the site to examine the field, coulee, "unnamed tributary," and adjoining wetlands. The EPA, including the field agent examining this site, does not have a clear standard to constrain the EPA's enforcement of the CWA against Defendants. The EPA acknowledges this fact in its Executive Summary of its new rule. *See* 80 Fed.

Reg. at 37056 ("As a result of the ambiguity that exists under current regulations and practice following these recent decisions, almost all waters and wetlands across the country theoretically could be subject to a case-specific jurisdictional determination.").

Neither the language of the CWA, nor the case law, nor the EPA's current rule on "waters of the United States" provides sufficiently clear standards to the EPA to guide enforcement. On this basis, as applied here, the Court should dismiss the Indictment as unconstitutionally vague.

## CONCLUSION

For the reasons stated above, the Court should dismiss the Indictment.

Respectfully Submitted this 17th day of May, 2016.

BROWNING, KALECZYC, BERRY & HOVEN, P.C.

By  */s/ M. Christy S. McCann*
      M. Christy S. McCann

Attorneys for FX Drilling, Inc.

SMITH & STEPHENS, P.C.

By  */s/ John E. Smith*
      John E. Smith

ARMSTRONG TEASDALE LLP

By  */s/ Kevin D. Evans*
      Kevin D. Evans

Attorneys for Quay Geza Torok

# CERTIFICATE OF COMPLIANCE

Pursuant to Criminal L.R. 47.2(a) and this Court's Order (Doc. 33), I certify that Defendants' Brief in Support of their Joint Motion to Dismiss Indictment, is double spaced, is a proportionately spaced 14 point typeface, and contains 7,370 words.

## CERTIFICATE OF SERVICE

I hereby certify that on the <u>17th</u> day of May, 2016, a true copy of the foregoing was served:

Via ECF to the following parties:

Kris A. McLean
Assistant U.S. Attorney
Ryan G. Weldon
Assistant U.S. Attorney
Eric E. Nelson
Special Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 8329
Missoula, MT 59807
Phone: (406) 542-8851
Fax: (406) 542-1476
Email: kris.mcLean@usdoj.gov
        Ryan.Weldon@usdoj.gov
        nelson.eric@epa.gov

 

 

 

  /s/ *M. Christy S. McCann*
BROWNING, KALECZYC, BERRY & HOVEN, P.C.