Mark D. Meyer
UGRIN, ALEXANDER, ZADICK & HIGGINS, P.C.
#2 Railroad Square, Suite B
P.O. Box 1746
Great Falls, MT 59403
Telephone: (406) 771-0007
Facsimile: (406) 452-9360
E-mail: mdm@uazh.com

Jeffrey C. Corey (Admitted *Pro Hac Vice*)
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone: (801) 536-6926
Facsimile: (801) 536-6111
E-mail: jcorey@parsonsbehle.com

Attorneys for Defendant FX Drilling Company, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**FX DRILLING COMPANY, INC.,**<br><br>Defendant. | **CAUSE NO. CR 16-20-GF-BMM**<br><br>**DEFENDANT FX DRILLING COMPANY, INC.'S SENTENCING MEMORANDUM** |

Defendant FX Drilling Company, Inc. ("FX Drilling"), by and through its counsel of record, Mark D. Meyer of Ugrin, Alexander, Zadick and Higgins, P.C. and Jeffrey C. Corey of Parsons Behle & Latimer, LLC, hereby submits the following Sentencing Memorandum. FX Drilling is scheduled to appear before the

Court on August 11, 2016, for a plea and sentencing hearing. As detailed below, the United States and FX Drilling have reached a Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.[1] Pursuant to that Plea Agreement, FX Drilling will plead guilty to both Counts alleged in the Indictment, namely, Negligent Discharge of Oil into Waters of the United States in a Quantity that May Be Harmful, in violation of 33 U.S.C. §§ 1321(b)(3), 1319(c)(1)(A), and Failure to Immediately Notify Appropriate Federal Agency of Discharge of Oil into Waters of the United States in a Quantity that May Be Harmful, in violation of 33 U.S.C. § 1321(b)(5), 18 U.S.C. § 2.

The parties have also requested that the Court conduct a sentencing hearing immediately following the entry of FX Drilling's guilty plea. For the reasons set forth herein, FX Drilling respectfully requests that the Court impose the stipulated punishment set forth in the parties' Plea Agreement.

## **INTRODUCTION**

The jointly recommended punishment in the Plea Agreement is appropriate given (1) the circumstances surrounding the offenses, including the accidental nature of the release and the lack of malice on the part of FX Drilling; (2) the fact that FX Drilling has already spent over $320,000 to clean up the impacted site; (3)

---

[1] An unexecuted copy of the Plea Agreement has been filed as Exhibit A to the parties' Joint Motion to Expedite Sentencing, Docket No. 82. The United States will file an executed copy prior to the August 11, 2016, hearing.

the company's pledge to pay an additional $100,000 penalty; and (4) the global downturn in oil and gas markets and the related impact on FX Drilling's ability to pay a fine.

It is undisputed that this case began with an accident. This is *not* a "midnight dumping" case. This is *not* a case involving a defendant who intentionally released pollutants into waterways or otherwise acted out of a desire to harm the environment. Due to no fault of FX Drilling or any of its employees, on or about June 11 or June 12, 2011, an underground pipe connecting two FX Drilling wells experienced a crack, resulting in a release of oil and process water. *See Offer of Proof*, Docket No. 83, at 5 ("The crack was not intentionally caused by the defendant or any of its employees."). It is undisputed that FX Drilling discovered the cracked pipe during a routine inspection within approximately 24 hours of the accidental crack. It is also undisputed that FX Drilling took immediate action to shut down the related wells, thereby stopping the release of any additional oil or process water from the cracked pipe. In the days that followed, FX Drilling also took action that, at the time, it believed would contain the oil and process water released from the cracked pipe.

FX Drilling acknowledges, however, that its initial response was inadequate. The company did not engage in a sufficient inspection of the impacted area. Had it done so, it would have understood that process water and oil had gone beyond the

immediate area surrounding the cracked pipe, flowing down a coulee and into a tributary of Cut Bank Creek. The scope of the flow of process water and oil was not obvious in part due to extreme amounts of rainfall that had occurred in the weeks leading up to the cracking of the pipe. Not only was the extreme rainfall the likely cause of the cracked pipe,[2] the resulting wet and muddy ground also impacted the company's ability to conduct an inspection in the coulee. While these circumstances do not excuse the negligent conduct described in Count I, they help explain how the company misjudged the scope of the release – and underscore that FX Drilling did not intentionally pollute Cut Bank Creek.

In the weeks, months, and years since July 12, 2011, FX Drilling has taken steps to make amends for its conduct. On July 12, 2011, FX Drilling hired an experienced outside consultant to ensure a proper response and cleanup process. The consultant was on site starting July 13, 2011, and immediately began coordinating cleanup with the relevant government authorities. Soon thereafter, FX Drilling also hired Indian Country Environmental Associates ("ICEA") to perform cleanup work. In total, FX Drilling spent $321,726.75 to clean up the impacted areas. *See Plea Agreement*, ¶ 3. It is undisputed that the company has satisfied its restitution obligation by cleaning up the site to the satisfaction of the

---

[2] *See United States' Offer of Proof*, Docket No. 83, at 5 ("The likely cause of the crack was shifting earth under and around the well as a result of high volumes of rainfall.").

U.S. Environmental Protection Agency ("EPA"). *See id.*; *see also Offer of Proof*, Docket No. 83, at 7.

FX Drilling views its Plea Agreement with the United States as the appropriate next step in its process of accepting responsibility. The parties agree that, given the facts of this case (including the facts set forth in Part IV below concerning FX Drilling's financial condition) the stipulated $100,000 penalty is appropriate. That penalty, combined with the reputational harm that will result from FX Drilling's convictions, is significant punishment that satisfies the purposes of sentencing set forth in 18 U.S.C. §§ 3553 and 3572.

## LEGAL AND PROCEDURAL BACKGROUND

FX Drilling has waived its right to a Pre-Sentence Investigation Report ("PSR") and, along with the United States, is requesting expedited sentencing on its guilty pleas to Counts I and II of the Indictment.

The U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") are less relevant in this case than in the normal case. The Guidelines are, of course, "only one of the factors to be considered in imposing sentence." *Gall v. United States*, 128 S.Ct. 586, 602 (2007). Here, the parties have stipulated that the standard Guidelines governing fines for organizational defendants, U.S.S.G. §§ 8C2.2 through 8C2.9, do not apply. *See Plea Agreement*, ¶ 6(a); *see also* U.S.S.G. § 8C2.1, Background Commentary ("the provisions of §§ 8C2.2 through 8C2.9 do

not apply to counts for which the applicable guideline offense level is determined under Chapter Two, Part Q (Offenses Involving the Environment)."); *United States v. BP Products N. Am. Inc*., 610 F. Supp. 2d 655, 681 (S.D. Tex. 2009) ("The Sentencing Guidelines provisions on fines for organizational defendants do not apply to environmental offenses.").

Given that the standard Guideline provisions for calculating a corporate fine do not apply, the Court should look to U.S.S.G. § 8C2.10 in determining an appropriate fine. U.S.S.G. § 8C2.10 simply states that a court is to "determine an appropriate fine by applying the provisions of 18 U.S.C. §§ 3553 and 3572." *See also* **BP Products N. Am. Inc.**, 610 F. Supp. at 682.

Accordingly, in determining what level of fine constitutes appropriate punishment for FX Drilling, the Court does *not* need to engage in a detailed Guideline calculation or analysis. Rather, the parties agree that the Court should look to the statutory sentencing factors set forth in §§ 3553 and 3572.

## ANALYSIS OF SENTENCING FACTORS

### I. The Proposed Punishment is Appropriate Given FX Drilling's Individual Characteristics and Will Promote Deterrence.

FX Drilling's unique characteristics and corporate history support the proposed $100,000 penalty and the other obligations set forth in the Plea Agreement. In determining an appropriate punishment, the statutory sentencing factors direct the Court to consider a defendant's particular characteristics,

6

including "the size of the organization" and the defendant's "history and characteristics." *See* 18 U.S.C. §§ 3572(8), 3553(a)(1).

FX Drilling was formed in 1994. It is, and always has been, a small exploration and production ("E&P") company that searches for and extracts crude oil and other hydrocarbons from the ground. Notably, FX Drilling does not own the oil it extracts and holds no interest in the underlying minerals. Its entire business is based on providing services to third parties that own oil rights in Northwest Montana, especially drilling-related and well operation services.

Prior to the recent downturn in oil and gas prices (discussed in more detail in Part IV below), the company normally maintained more than 20 full-time employees. The company has recently faced significant economic pressures (also discussed in Part IV below) that have resulted in the decrease of its workforce to just 12 full-time employees.

The company has no prior criminal record. The 2011 spill was the first and only major release in its corporate history. The Plea Agreement will help ensure its future environmental compliance, as it requires the company to obtain EPA's approval on an updated Spill, Prevention, Control, and Countermeasure Plan ("SPCC Plan").[3] *See Plea Agreement*, ¶ 3. The company has already provided an

---

[3] An SPCC Plan is a written document that certain oil companies must maintain in accordance with federal law. These plans promote compliance by requiring regulated entities to detail information regarding storage tanks, secondary

7

updated SPCC Plan to EPA and has reached an agreement with EPA to make any needed changes to that plan on an expedited basis.[4]

For a company as small as FX Drilling, the proposed punishment will have a substantial deterrent impact. *See* 18 U.S.C. § 3553(a)(2) (requiring evaluation of whether a sentence "afford[s] adequate deterrence to criminal conduct"). Given the company's small size, every employee is aware of the seriousness of the case. Having experienced criminal prosecution in this case, the company and its employees are well aware of the need to adhere to the highest standards of environmental compliance in the future.

Moreover, the penalties proposed in the Plea Agreement will also promote general deterrence. If the Court approves the proposed penalty, the record of the case will serve as a lesson that companies must do better in responding to unintentional releases. The proposed penalty will show that even spills that begin as accidents will be met with significant sanctions.

---

containment, employee training, and protocols for responding to and controlling spills. *Cf.* EPA, SPCC Regulation: A Facility Owner/Operator's Guide to Oil Pollution Prevention (June 2010), *available at www.epa.gov*.

[4] FX Drilling had a SPCC Plan in 2011 at the time of the spill and revised its plan in 2014 and 2015. Although companies do not normally have to submit their plans to EPA for approval, FX Drilling has agreed to do so in the Plea Agreement.

## II. The Proposed Punishment is Consistent with the Nature and Circumstances of the Offense.

FX Drilling acknowledges the seriousness of its conduct. However, FX Drilling respectfully requests that the Court consider the full context of the offense conduct – including its lack of malice. Unlike many environmental criminal cases, this case does not involve any actor who engaged in intentional dumping, disposal, or any other purposeful release that they knew would result in environmental harm.

The parties agree that FX Drilling's first offense (Count I) occurred when it failed to properly evaluate and contain oil and process wastewater released from the cracked pipe. The company admits it should have engaged in a much more thorough evaluation of the release in the immediate hours and days following the discovery of the cracked pipe. This conduct, however, simply does not warrant any penalty beyond what the parties have agreed to in the Plea Agreement.

The parties agree that FX Drilling acted negligently in its failure to contain the oil and process water that was released from the cracked pipe. The Clean Water Act's negligence standard is not a high one. Rather, the Clean Water Act is the rare federal law that imposes criminal sanction on "a person who acts with ordinary negligence." ***United States v. Hanousek*,** 176 F.3d 1116, 1126 (9th Cir. 1999). Given the facts and the legal standards involved in this case, the proposed $100,000 penalty sufficiently accounts for the offense set forth in Count I of the Indictment.

The proposed $100,000 penalty also sufficiently accounts for the conduct set forth in Count II. Count II sets forth what is, at its core, a notification offense. Specifically, Count II charges that FX Drilling "failed to immediately notify" the federal government after learning of the spill, in violation of 33 U.S.C. § 1321(b)(5). *See Indictment*, Docket No. 2, ¶ 21.

FX Drilling admits that it committed the offense set forth in Count II by failing to call the National Response Center ("NRC") when it learned of the spill on July 12, 2011. The NRC is a hotline operated by the U.S. Coast Guard for purposes of reporting oil spills. The government's evidence, as set forth in its Offer of Proof, is that on July 12, 2011, an official with the Blackfeet Environmental Office ("BEO") met with an FX Drilling field supervisor at the site and told the field supervisor that he was legally obligated to call the NRC to report the spill.[5] The field supervisor, however, does not recall being provided with those instructions. That factual discrepancy, however, is immaterial. After responding to the site and meeting with the BEO official, the field supervisor had multiple conversations with staff at FX Drilling's administrative office regarding the release. By the afternoon of July 12, 2011, the company had received multiple reports concerning the release from multiple sources. It is undisputed that, on July

---

[5] *See Offer of Proof*, Docket No. 83, at 6 ("BEO personnel advised the field supervisor that the oil spill had reached Cut Bank Creek, and that FX Drilling Company, Inc. was legally obligated to contact the National Response Center to report the spill.").

12, 2011, FX Drilling was aware of the release and failed to notify the NRC. No employee placed a call to the NRC, despite receiving multiple phone calls about the spill. Ultimately, by approximately 4:00 p.m. on July 12, 2011, staff at FX Drilling's administrative office notified an FX Drilling manager of the release. The FX Drilling manager (who was working at another site several Counties away) responded by immediately calling an environmental consultant to begin cleanup work and manage the response to the release – but did not also place a call to the NRC.

The company's failure to call the NRC on July 12, 2011 was, without question, a violation of 33 U.S.C. § 1321(b)(5). However, it is also important to place that violation in context. There is no evidence that the company's failure to immediately notify the NRC resulted in increased environmental harm. The BLO was already aware of the release on July 12, 2011, and had sent personnel to the site. FX Drilling employees also responded to the site on July 12, 2011. Also on July 12, 2011, the company hired a consultant to begin cleanup work. Soon thereafter, the consultant was coordinating the company's cleanup efforts with several governmental agencies. Given this context, this clearly is *not* a case where a defendant failed to call the NRC as part of a plan to hide an oil spill or to avoid cleanup obligations. Accordingly, there are no aggravating factors related to the Count II notification offense that would support a higher penalty.

Moreover, in evaluating the proposed penalty, the Court should also consider FX Drilling's cleanup work *after* July 12, 2011.  It is undisputed that, after learning of the full scope of the release, FX Drilling engaged in an extensive cleanup of the site at a cost of over $320,000.  That cleanup work was completed by the Fall of 2011.  There are no known permanent impacts of the spill.  Fortunately, the release did not result in any loss of human or animal life.  As a result of the cleanup work, the site has been returned to its natural condition.  Although FX Drilling was certainly obligated to engage in this cleanup work, the fact that the company quickly completed this work to EPA's satisfaction is a mitigating factor that supports the parties' proposed penalty.

### III. The Proposed Punishment is Similar to Analogous Clean Water Act Cases and Would Avoid Unwarranted Sentencing Disparities.

The stipulated $100,000 penalty is also consistent with other environmental criminal cases involving accidental releases.  *See* 18 U.S.C. § 3553(a)(6) (identifying "the need to avoid unwarranted sentence disparities among defendants . . . who have been found guilty of similar conduct" as a factor Courts must consider in imposing a sentence).

#### A. Penalties in Analogous Cases Involving Clean Water Act Negligence Offenses are Similar to the Proposed Penalty.

Cases involving defendants who are convicted of the same or similar Clean Water Act offenses involved in this matter – *i.e.*, offenses involving an admission

of *negligent* conduct – demonstrate the appropriateness of the stipulated penalty in this case. For example, in 2011 this Court fined T.P. Construction, Inc., $25,000 following its plea of guilty to one count of negligently discharging sewage in violation of the Clean Water Act. *See Judgment Order*, Docket No. 9, ***United States v. T.P. Construction***, 4:11-CR-65 (D. Montana 2011). Although T.P. Construction pled guilty to a negligent violation of the Clean Water Act, the Offer of Proof filed in the case stated that the defendant intentionally (and illegally) dumped septic waste in the yard of a citizen of the Fort Belknap Indian Reservation without the citizen's permission. *See Offer of Proof* at 3, Docket No. 5, ***United States v. T.P. Construction***, 4:11-CR-65 (D. Montana 2011) (noting that the septic waste was dumped near where the citizen's children often played). As part of its plea agreement with T.P. Construction, the government agreed to recommend a $25,000 penalty, which is what the Court ultimately imposed.

Similarly, in 2013, the United States District Court for the District of Massachusetts imposed a $75,000 fine on a defendant who pled guilty to negligently discharging oil in violation of the same provisions of the Clean Water Act at issue in this case, 33 U.S.C. §§ 1321(b)(3), 1319(c)(1)(A). *See Amended Judgment Order*, ***United States v. McKissick***, 12-CR-40054 (D. Mass. 2013).

Although courts have sometimes imposed penalties above $100,000 for negligent violations of the Clean Water Act, these penalties are typically associated

with defendants that are much larger and wealthier than FX Drilling. For example, in 2009, the Washington Metropolitan Area Transit Authority – a vastly larger and wealthier entity than FX Drilling[6] – was ordered to pay a $200,000 fine after it pled guilty to negligently discharging acidic water into a local sewer system, in violation of the Clean Water Act. *See Judgment Order*, Docket No. 11, ***United States v. Washington Metropolitan Area Transit Authority***, 09-CR-557 (D. Maryland 2009).

> **B. Penalties in Clean Water Act Cases Involving Intentional Dumping or other Malicious Acts are Often Much Higher than the Proposed Penalty.**

In contrast to the cases discussed above, a review of outcomes in Clean Water Act criminal cases suggests that penalties well above $100,000 often are imposed in cases with aggravating facts not present here.[7] For example, in a recent Clean Water Act criminal case, the Southern Grease Company was sentenced to pay a fine of $280,000 after it pled guilty to knowingly violating the Clean Water

---

[6] For fiscal year 2017, WMATA has proposed a $3.1 *billion* budget. *See* WMATA, FY2017 Proposed Budget at I-12, *available at* www.wmata.com/about_metro/docs/ FY2017%20Proposed%20Budget.pdf. The agency employed 12,995 people in FY2016. *Id.* at 224.

[7] These penalty trends are based on FX Drilling's extensive review of outcomes in Clean Water Act criminal cases over the past ten years. Although the trends identified herein are a reasonable characterization of outcomes, FX Drilling also acknowledges that its analysis is subject to limitations due to the fact that sentences are tailored to the unique facts of each case and the unique characteristics of each defendant.

Act, in violation of 33 U.S.C. § 1319(c)(2)(A). *See Judgement Order* at 2, Docket No. 85, ***United States v. Southern Grease Company, Inc***., 3:15-cr-33 (M.D. Tenn. Feb. 19, 2016). In that case, the Southern Grease Company admitted that, for a nearly two-year period from 2011 to 2013, it intentionally and illegally discharged restaurant grease into municipal sewer systems while billing its customers fees for proper grease disposal. *See Plea Agreement* at 5-6, Docket No. 3:15-cr-33 (M.D. Tenn. June 9, 2015). Fine amounts well above $100,000 can be found in other cases involving intentional dumping and other aggravating factors. *See, e.g.*, *Judgment Order*, Docket No. 32, ***United States v. Freedom Industries, Inc***., 2:14-cr-275 (S.D.W.Va. February 19, 2016) (imposing $900,000 fine after release resulted in a complete shutdown of the municipal water system of Charleston, West Virginia, for several days, thereby leaving thousands of residents without drinking water); *Judgment Order*, Docket No. 15, ***United States v. The Tap Root Dairy, LLC***, 1:13-mj-61 (W.D.N.C. May 6, 2015) (imposing $150,000 criminal fine on company that admitted to (a) intentionally and illegally discharging 40 pounds of ammonia into St. Paul Harbor and (b) denying discharge when questioned by fire department).

**C. In Considering Comparable Cases, the Court Should Give Weight to the Government's Support of the Stipulated Penalty.**

In addition to the foregoing case examples, the Court should also give weight to the fact that the United States has approved the agreed-upon $100,000

penalty. The EPA, which has been represented in this case by a Special Assistant United States Attorney, is perhaps in the best position to know what kind of penalty is reasonable relative to other Clean Water Act cases. The fact that the United States has approved the stipulated penalty in this case should add to the Court's confidence that the penalty is appropriate and generally consistent with factually similar Clean Water Act cases.

## IV. The Proposed Punishment Properly Accounts for FX Drilling's Financial Circumstances.

In their Plea Agreement, the parties have also stipulated that, in evaluating the statutory sentencing factors, the Court should consider FX Drilling's ability to pay a fine. *See Plea Agreement*, ¶ 7.

A brief background concerning oil markets and FX Drilling's business model may assist the Court in evaluating the company's ability to pay a fine. Understanding the current economic conditions surrounding FX Drilling's business should also help the Court appreciate FX Drilling's commitment to pay $100,000, notwithstanding the current grim economic conditions. Notably, these financial considerations, while a mitigating factor for purposes of imposing punishment, were *not* the cause of the 2011 offenses. Unlike many environmental criminal cases, the company did not engage in the offenses at issue due to economic pressures. Rather, the financial problems described herein arose many years after

the offenses and, although relevant to sentencing, have nothing to do with the reasons why the offense conduct occurred.

FX Drilling has been significantly impacted by the collapse in crude oil prices that began in September, 2014. FX Drilling is in the business of providing drilling and well operation services to third parties. FX Drilling does not own or sell oil. Instead, it is a service provider to those who do. As such, its business is completely dependent on the economics of oil markets – especially whether the price of oil supports drilling activities or continued operation of existing wells.

Companies that produce and sell oil in North America base their oil sales contracts on the monthly New York Mercantile Exchange ("NYMEX") West Texas Intermediate ("WTI") benchmark price. The WTI benchmark is based on the Texas light sweet crude oil quality. If crude oil is of a lesser quality than the WTI benchmark, such oil would receive a price differential less than the WTI price for the lower quality oil. The Northwest Montana wells where FX Drilling operates produce a less quality crude oil and are priced off of the differential known as the North West Montana Sour price ("NWMT Sour").[8] As such, these wells are less profitable relative to the WTI benchmark.

---

[8] The NWMT Sour benchmark price is less than WTI because the crude oil contains more sulfur and is a lesser quality oil than the WTI Texas light sweet crude oil. The NWMT Sour price differential from WTI is approximately $10 to $12 a barrel less than WTI.

In September of 2014, the global crude oil price started to collapse. The WTI price of oil was above $125 per barrel in 2012, and remained relatively strong above $100 a barrel until September 2014, after which it entered a sharp downward spiral, falling below $30 by January 2016 and to as low as $26 a barrel. WTI prices have partially rebounded and now trade at $45 a barrel.

Although higher than the January, 2016, market bottom price, the current price of oil is not sufficient for FX Drilling to sustain its business. For FX Drilling to be able to break-even on the services it provides to third parties, oil needs to be trading at approximately $65 per barrel at WTI.[9] Currently the WTI price is at approximately $45 per barrel.

The downturn in oil prices since September, 2014, has had a dramatic impact on the company's annual bottom line. For the 12-month period ending December 31, 2015, FX Drilling had a net loss of over $3.5 million. As of May 31, 2016, the company has a net loss in the amount of $665,000.

Notwithstanding its current poor economic situation, FX Drilling has *already borrowed and set aside* the $100,000 penalty stipulated in the Plea Agreement. If FX Drilling were a bad actor or were not committed to accepting responsibility in this case, it could seek to avoid payment of any penalty by declaring bankruptcy. Instead, FX Drilling is committed to operating its business

---

[9] This breakeven point is before any of the Company's general administrative expenses (G&A) or debt service.

while also being a responsible corporate actor with respect to how it resolves this case. To that end, FX Drilling recently entered into negotiations with the government in a good faith effort to reach a stipulated penalty that is fair and proportional to the conduct at issue in this case. During those negotiations, FX Drilling shared its financial information with the government, including its detailed cash flow statement and balance sheet. Those negotiations have produced a penalty that is fair given all the circumstances of this case, including the company's poor financial condition.

FX Drilling's current financial condition is also a reason for the Court to sentence FX Drilling on an expedited basis. As already noted, the company has set aside the $100,000 penalty and is ready to pay that penalty immediately. A delay in sentencing, however, could create additional uncertainty as to the company's ability to pay the stipulated penalty. Even a delay of a few months could be detrimental to the company's ability to pay the agreed on penalty, given current uncertainties regarding oil prices and the company's business. The company's ability to pay the penalty *now* was a factor in the parties' decision to ask for expedited sentencing. Given the foregoing information regarding oil markets and FX Drilling's economic condition, the company requests that the Court allow the parties to achieve finality in this case on an expedited basis.

## **CONCLUSION**

For the foregoing reasons, FX Drilling requests that the Court impose the stipulated sentence set forth in the Plea Agreement.

DATED this 25 day of July, 2016

By: _____/s/_Mark D. Meyer_____
Mark D. Meyer
Ugrin, Alexander, Zadick & Higgins, P.C.
Attorneys for Defendant FX Drilling Company, Inc.

By: _____/s/ Jeffrey C. Corey_____
Jeffrey C. Corey, admitted *Pro Hac Vice*
Parsons Behle & Latimer
Attorneys for Defendant FX Drilling Company, Inc.